UNITED STATES of America,
Plaintiff-Appellee,

v.

Talmon HEGWOOD, Jr.,
Defendant-Appellant.

No. 77–5249
Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

Nov. 10, 1977.
Rehearing Denied Dec. 12, 1977.

---

* Rule 18, 5 Cir.; see *Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al.*, 5 Cir., 1970, 431 F.2d 409, Part I.

Before BROWN, Chief Judge, CLARK and HILL, Circuit Judges.

JOHN R. BROWN, Chief Judge:

On February 2, 1977, a jury found Talmon Hegwood, Jr. guilty of bank robbery in violation of 18 U.S.C.A. § 2113(a). Hegwood contends on this appeal that the trial court erred in refusing to subpoena an ostensible alibi witness pursuant to Rule 17(b), F.R.Crim.P. and in denying his motions for a continuance. We find no merit in either contention and affirm.

So that the reader can grasp the limited scope of our holding today, it will be necessary to set forth the facts in some detail.[1]

### I. Hedging By Hegwood:

#### Round I

The First National Bank of Atlanta was robbed on August 8, 1975. Following the indictment of Hegwood for this offense, the case was assigned to Judge Freeman who appointed counsel for the defendant. Trial was subsequently set for November 29, 1976.

During the pre-trial proceedings, the government, pursuant to Rule 12.1, F.R. Crim.P., demanded that Hegwood give notice of any alibi defense he intended to use. R. at 533. This demand was never answered. During this same period, appellant moved to dismiss his court-appointed counsel, requesting permission to act pro se. The defendant was informed that if he was dissatisfied with his present attorney, legal assistance was available to him from the Federal Defender Program. R. at 534–36. Despite this, Hegwood insisted on representing himself and his motion was granted. R. at 534–36, 542, 554.

On November 26, 1976, three days before the trial, Hegwood requested in writing that subpoenas pursuant to Rule 17(b), F.R.

John R. Martin, Asst. Federal Public Defender, Atlanta, Ga., for defendant-appellant.

Wm. L. Harper, U.S. Atty., Jerome J. Froelich, Jr., Asst. U.S. Atty., Atlanta, Ga., for plaintiff-appellee.

---

1. The only facts related are those pertinent to the two issues raised on this appeal.

Crim.P. be issued to Bennett Hegwood of Chicago and to Mrs. Mildred Kelley, Director of Records, Jackson State University, Jackson, Mississippi. As we point out shortly, the Kelley subpoena was sought to establish an alibi. The subpoenas were issued that same day. R. at 556–61.

During the first trial, the defendant attempted to establish that on the date of the robbery, August 8, 1975, he had taken a final examination in a course taught by Professor Thompson at Jackson State University in Jackson, Mississippi. Mrs. Mildred Kelley produced the pertinent school records and testified that Hegwood had been enrolled in Professor Thompson's course that summer, receiving a grade of "Incomplete". The class roll book was introduced in evidence but it did not disclose specific dates of absence or presence of any of the students, the exact date on which the final exam was given, or whether Hegwood in fact took the final. R. at 396–401. Pressed on cross-examination, Mrs. Kelley stated that there was no way that she could testify that Hegwood was in class on August 8. R. at 401. Mrs. Kelley further testified that an "Incomplete" would be given if a student failed to take the final examination or to complete class assignments. R. at 400. Professor Thompson was never subpoenaed to testify during the trial.

After the jury was unable to agree on a verdict, Judge Freeman entered an order dated December 3, 1976 declaring a mistrial. R. at 562. Judge Freeman recused himself from presiding on the retrial and the case was assigned to Judge Henderson on December 23, 1976. R. at 574.

### Round II

The new trial was set for January 31, 1977. Appellant was informed of the new date a little more than six weeks in advance of trial. R. at 29. As before, Hegwood let the Court know that he wished to act pro se. R. at 4. On January 6, 1977, Hegwood, through Andrew H. Marshall of the Federal Defender Program, requested that three subpoenas be issued pursuant to Rule 17(b).[2] Magistrate Chancey granted this request that same day. R. at 575–76. On January 19, 1977, another Rule 17(b) subpoena application was filed; this too was granted.[3] No application was ever made during this period to subpoena Dr. Thompson at government expense.

On the day the trial was to begin, Monday, January 31, 1977, Judge Henderson met in chambers with Hegwood, Mr. Marshall and Mr. Froelich, Assistant U.S. Attorney. During this conference, Judge Henderson first addressed the problem of Hegwood's desire to act pro se. After being informed that the defendant wished to represent himself despite the availability of court-appointed counsel, Judge Henderson explained that Mr. Marshall of the Federal Defender Program was to sit at the counsel table and assist in the defense if needed. R. at 4–6. The Judge then outlined the trial procedure for the defendant and asked Hegwood, "Do you have any witnesses besides yourself?" Hegwood replied, "No." R. at 8.

Following talk of other matters, Hegwood for the first time raised the question of calling "another witness." In response to the defendant's enumeration of problems encountered in obtaining his witnesses, the Judge pointed out that Hegwood had known the case was going to trial for some time. Hegwood then announced, "I'm ready." R. at 19. When Marshall raised the matter of the prior subpoenas and his attempts to contact witnesses for the defense, the Court asked Mr. Froelich to leave the room. R. at 20.

Discussion then focused on the witnesses already subpoenaed. Of primary relevance

---

2. The witnesses to be subpoenaed were (i) Mrs. Mildred Kelley, Director of Records, Jackson State University; (ii) Custodian of Records, South Chicago Hospital, Chicago; and (iii) Dr. Bernadine Pietrasek, DePaul University, Chicago.

3. The witness subpoenaed pursuant to this request was Marvin Cooper of Jackson, Mississippi. R. at 577–79.

here was Mrs. Mildred Kelley who had testified at the first trial. Hegwood stated that if the government would stipulate to the authenticity of the school records which had been admitted during the first trial, it would be unnecessary to have Mrs. Kelley appear. R. at 22. Marshall pointed out that the government had refused to so stipulate and went on to report:

> Friday afternoon Mr. Hegwood told me that he was not interested in those records and that I was to contact the custodian of records at Jackson State and excuse her from the subpoena.

> I explained to Mr. Hegwood that without a witness, since I couldn't get a Government stipulation as to the authenticity of the records, that it wouldn't be possible for him to get those records in evidence. Nevertheless, he indicated to me to go ahead and excuse that witness.

R. at 23 (emphasis added). See note 2, *supra*.

Thereafter, Hegwood—for the first time—explained that he had requested Mr. Marshall to contact Dr. Thompson. R. at 24–25. Marshall then detailed his unsuccessful efforts to reach the professor by telephone and the following exchange took place:

> [MR. MARSHALL:] . . . *So, I cannot state to the Court what Dr. Thompson would testify to,* because I have been unable, despite diligent efforts on my part, to contact him. . . .

> And I have told Mr. Hegwood, and this is my feeling about it, that if he—and, of course, subject to whatever the Court's decision on the matter is—*that he should not announce ready if he wants me to continue to try to get ahold of Dr. Thompson to see what he would testify to.* . . .

> THE COURT: What would Dr. Thompson testify to?

> MR. HEGWOOD: Your Honor, *I feel as if Dr. Thompson could shed some light as to the fact that I was indeed in his class on the date of the alleged bank robbery,* and I think, too, that if a subpoena had been issued and had been forwarded to Jackson State University, Dr. Thompson would have honored that subpoena. . . .

> THE COURT: Why are all these problems coming up now? How long has it been since this case has been on the calendar, Mr. Clerk?

> THE CLERK: Judge, I don't have that record here, but I can find out. It's been some time.

>     *    *    *    *    *    *

> MR. HEGWOOD: *It's been a little more than six weeks.*

>     *    *    *    *    *    *

> THE CLERK: Judge, I anticipated something like this might come up, and last Thursday I called the Magistrate's office to see if there were any subpoenas that had been issued that the Clerk's office should look into, and I was informed by Judge Chancey's secretary that all the subpoenas had been taken care of, everything that had been requested.

> MR. MARSHALL: Again, I went— Judge Chancey told me he would not authorize the issuance of the subpoena to anybody unless I, as an officer of the court, could state to the Court what we would expect to prove by their testimony, and, as I have already told the Court—

> THE COURT: Can you, Mr. Marshall, tell me now that Dr. * * * [Thompson] will testify that the defendant was in his class on the day of this alleged robbery?

> MR. MARSHALL: *I cannot state that to the Court. I do not know what Dr. Thompson could testify to.*

> MR. HEGWOOD: Your Honor, I have his roll book here. It was entered into evidence at the last trial. I could show it to Your Honor, and Your Honor could make a judgment from there and see how important or see whether or not Your Honor feels—

THE COURT: If it's an alibi, it's very important.

MR. MARSHALL: To the best of my knowledge, Dr. Thompson was not subpoenaed to the first trial.

R. at 28–30 (emphasis added).

Further discussion concerning Hegwood's delay in bringing the Thompson matter to the Court's attention prompted this attempted resolution:

MR. HEGWOOD: Your Honor, I feel as if it's not necessary to subpoena this witness if the Government attorney will stipulate the authenticity [of the school records].

THE COURT: On your way out you can ask Mr. Froelich if he will or not. That's between you and him. Or you can ask Mr. Marshall to perform that service for you.

4. After the jury was selected, this additional colloquy took place:
THE COURT: Gentlemen, do you have your witnesses here?
MR. FROELICH: Your Honor, I don't have all of them, but I have a group of them out in the hall. I have about four or five.
THE COURT: How about you, Mr. Hegwood?
MR. HEGWOOD: Defense is ready, Your Honor.
R. at 39.

5. MR. HEGWOOD: Your Honor, the records depict that I was in a classroom on the date in question, on the date of the alleged—
THE COURT: Where does it say that? Where does it show that?
MR. HEGWOOD: Let me show it to you, Judge.
THE COURT: If I were you, I would have gotten the professor here.
MR. HEGWOOD: That's what I wanted to do.
THE COURT: You have had six weeks to do it, and you haven't done it. It shows that you were enrolled—
MR. HEGWOOD: Okay.
THE COURT:—in a class on one Thursday in Black History 362. It doesn't show—
MR. HEGWOOD: The dates—turn a couple more pages.
THE COURT: Here's a catalog.
MR. HEGWOOD: It's depicted in the catalog what date the class started and what date it ended and what date the final examination was, and the grade I received was an incomplete, and I could not have received an incomplete had I not taken the final examination.

MR. MARSHALL: As I told the Court, I did make that offer to Mr. Froelich, and he indicated he would not stipulate.
THE COURT: Let him make it to him in person and see if he will agree to it.
R. at 32–33.

Despite counsel's advice set forth above, Hegwood announced in open court before the jury that the defense was ready.[4] R. at 36. The government then proceeded with its case-in-chief.

On February 1, the government rested. R. at 316. Hegwood then sought to introduce into evidence the school records admitted during the first trial. He stated, however, that if the government refused to stipulate to their introduction, "the defense moves for a continuance in order to have that person who can attest to these records come and give testimony." R. at 319. After the Court and the parties discussed precisely what the school records reflected,[5]

THE COURT: I thought you said your grade was "incomplete".
MR. HEGWOOD: The grade was "incomplete".
THE COURT: Evidently, if you had an incomplete, you must not have taken the final exam.
MR. HEGWOOD: No. I took the final examination. I did not take the midterm
. .  . .
THE COURT: Well, this document itself does not reveal that you were in class at Jackson State University, State College, on August the 8th, 1975.
MR. HEGWOOD: Judge, I didn't show you this.
THE COURT: It simply does not reflect that. I don't care what the catalog says.
MR. HEGWOOD: See, here's the date for the last final examination. All right, Friday, August 9th. Now, if that instructor had been here, that instructor could have even brought my examination here.
THE COURT: Well, you just said you didn't take the examination.
MR. HEGWOOD: I didn't take the midterm, Your Honor. *I took the final examination, and it was given on August 9th.*
THE COURT: If you want to get on the stand and testify to that, you may do so.
* * * * * *
THE COURT: . . .
Just looking at that document alone, it would not be admissible, because it has no probative value, and you had the opportunity to subpoena these witnesses, and in one instance you canceled the subpoena, and in the other instance you failed to subpoena the witness.

the defendant again moved for a continuance. R. at 325.

Subsequently, the Court had one more crucial exchange with Mr. Marshall:

THE COURT: I am not going to make you contact the custodian of records. You did what you thought—you followed instructions last Friday. If he wants to contact them, he can do so. If you want to help him get those persons by phone tonight, you may do so, and I would ask that you try to help him.

MR. MARSHALL: Yes, sir, I will be happy to do that. But, if I can get them here, then you are saying that you will pay them their witness fee, whatever?

THE COURT: I will have the Clerk issue a subpoena, and, . . . *if you will give me an affidavit that their testimony is essential to the trial of the case.*

MR. MARSHALL: *I cannot give Your Honor that kind of affidavit.*

THE COURT: If the defendant will give me an affidavit to that effect, I will authorize the expenditure of their expenses.

R. at 332–33 (emphasis added). The record is conspicuously barren of any responsive representation ever having been made by Hegwood or his counsel that Thompson would give testimony that was essential or even helpful to the defense.

In an effort to accommodate the defendant's demands, the Court agreed to recess on Tuesday so that the defense could attempt to arrange for Dr. Thompson's voluntary appearance the next day. R. at 325–37. However, Marshall reported on Wednesday that he had been unable to reach the professor by phone. R. at 341–42.

Nonetheless, Hegwood announced that he was ready to go forward. R. at 343. The defendant recalled a government witness and twice more moved for a continuance. R. at 351, 355. Hegwood then recalled two

other government witnesses. During the examination of the second, Hegwood once again moved for a continuance, this time in order to take the jury to the bank. R. at 369. After the completion of the testimony of these witnesses, Hegwood moved for a continuance until 12:00 to see whether any of his witnesses had arrived. R. at 373. He then requested that the roll book be introduced in evidence, which prompted this colloquy:

MR. HEGWOOD: I canceled the subpoena on the grounds that the director of records could not testify to the instructor's roll book.

THE COURT: Well, the point is they are not under subpoena any more.

MR. HEGWOOD: I would like to introduce into evidence the instructor's roll book from Jackson State University.

THE COURT: We have been through that. I have already ruled on that, haven't I, Mr. Hegwood?

MR. HEGWOOD: Judge, I'm asking you for a continuance.

THE COURT: I ruled on that yesterday.

MR. HEGWOOD: In the event these people may show up.

THE COURT: I ruled on that yesterday afternoon.

MR. HEGWOOD: The defense is not going to rest, Judge.

THE COURT: Call your next witness, then.

MR. HEGWOOD: Well, my witnesses are not here.

THE COURT: Well, do you have any other witnesses to call who are here?

MR. HEGWOOD: No, I don't.

THE COURT: Very well, do you have any other evidence to offer, then?

MR. HEGWOOD: Yes, I do.

THE COURT: All right, offer it.

MR. HEGWOOD: The defendant offers into evidence the roll book of Dr.

As I have said, I can't now continue the case for you to get those witnesses in, so I will have to decline to admit that particular record.

R. at 321–24 (emphasis added). In connection with Hegwood's statement in italics above, it is noteworthy that the robbery occurred on August 8.

Julian Thompson, professor at Jackson State University, which will show that the defendant—

MR. FROELICH: Excuse me, Your Honor.

THE COURT: Just a minute. I am not going to go into that. I have looked at the exhibit. It doesn't show what you say it shows. I have ruled on it yesterday afternoon, and I declined to admit it into evidence.

MR. HEGWOOD: Give it to the jury. Let them decide.

THE COURT: That's not a matter for the jury to decide. It is for the Court to decide what is relevant evidence and what is admissible evidence and what is not admissible evidence.

MR. HEGWOOD: The defense moves for a continuance to go to the hospital to have an operation.

R. at 375–76.

After considerable discussion and agreement by the government, Judge Henderson ordered that the untranscribed notes of Mrs. Kelley's testimony at the first trial be read before the jury. R. at 410–21. The school records were also allowed in evidence. R. at 422. With that, the defendant rested. The jury returned a verdict of guilty.

## II. Rule 17(b)

█ Rule 17(b), F.R.Crim.P. reads in pertinent part as follows:

(b) **Defendants Unable to Pay.** The court shall order at any time that a subpoena be issued for service on a named witness upon an *ex parte* application of a defendant upon a satisfactory showing that the defendant is financially unable to pay the fees of the witness and that the presence of the witness is necessary to an adequate defense. . . .

A motion made pursuant to this rule must, as a threshold matter, state facts that show the relevancy and the necessity of the requested witness' testimony. *United States*

*v. Abshire*, 5 Cir. 1972, 471 F.2d 116, 119; *United States v. Romano*, 5 Cir., 1973, 482 F.2d 1183, 1195, *cert. denied*, 1974, 414 U.S. 1129, 94 S.Ct. 866, 38 L.Ed.2d 753. This requirement makes total sense in view of the plain language of the rule and the fact that Rule 17 is clearly not a discovery device. *See United States v. Schembari*, 4 Cir., 1973, 484 F.2d 931, 936.[6]

█ The decision to grant or deny a Rule 17(b) motion is vested in the sound discretion of the trial court. *E. g., United States v. Hathcock*, 5 Cir., 1971, 441 F.2d 197, 199. In making its decision, the court may consider—in addition to necessity and relevance—materiality, competency and the timeliness of the request. *United States v. Moudy*, 5 Cir., 1972, 462 F.2d 694, 698. *Moudy* teaches that the trial court is justified in preventing abuse of process when a defendant seeks a subpoena merely to delay the proceedings. *Moudy* stated:

Last minute tactics designed to bring the trial process to a halt are not to be countenanced.

*Id.* at 698. *See also Hathcock, supra*, 441 F.2d at 200; *United States v. Collins*, 7 Cir., 1970, 435 F.2d 698, *cert. denied*, 1971, 401 U.S. 957, 91 S.Ct. 983, 28 L.Ed.2d 241; *cf. United States v. Nichols*, 9 Cir., 1976, 534 F.2d 202; *United States v. Stoker*, 10 Cir., 1975, 522 F.2d 576.

█ Equally well established in this Circuit is the principle that the trial court's discretion to decide whether to issue a Rule 17(b) subpoena is not absolute:

The breadth of the discretion to be exercised by the trial court under Rule 17(b) is considerably narrowed by two constitutional rights of the defendant: (1) the Sixth Amendment right "to have compulsory process for obtaining witnesses in his favor"; and (2) the Fifth Amendment right to protection against unreasonable discrimination which means that, as between those financially able and those financially unable to pay the fees of the witness, there should be no more discrimination than is necessary to protect against abuse of process.

---

**6.** As we have previously pointed out, Judge Henderson was scrupulously careful to discuss the Rule 17 subpoenas outside the presence of Mr. Froelich.

*Welsh v. United States*, 5 Cir., 1968, 404 F.2d 414, 417 (footnotes deleted). *Welsh* further establishes that once the defendant asserts facts which, if true, would be relevant to any issue, the motion for a subpoena *must* be granted unless the assertions are facially incredible or unless the government can show that they are untrue or that the request is frivolous. *Welsh, supra; United States v. Hathcock, supra*, 441 F.2d at 199. Such facts having been stated, the burden of showing lack of truth, frivolousness or abuse of process falls on the government. *Id.* at 200.

▮ Applying these principles to the case before us in light of the facts set forth in Part I, we are firmly convinced that Judge Henderson did not abuse the discretion reposed in him.

First, by his own admission, Hegwood knew for six weeks prior to January 31 that the trial date had been set. Second, it is clear that he knew how to request Rule 17(b) subpoenas when he really desired to do so. Third, Thompson resided in Mississippi and the trial was proceeding in Atlanta. Location of the witness and the time problems involved in summoning him are very practical considerations for a trial judge to assess.

Fourth, and most important, neither Hegwood nor his counsel ever made any representation to the Court that Professor Thompson's testimony would have been helpful, much less that it was necessary to an adequate defense. Indeed, they could not have done so, since neither Hegwood nor Marshall ever spoke with him. The strongest—and we use that adjective charitably—representation made by appellant was, "I feel as if Dr. Thompson could shed some light as to the fact that I was indeed in his class on the date of the alleged bank robbery . . .." R. at 28. Any light that Thompson could have shed dims almost to the point of blackout in view of the fact that Thompson was not subpoenaed for the first trial and no formal request for his presence was made until the Eleventh Hour at the second, even though the defense of alibi was the critical one at both trials.

Under these circumstances, the Trial Judge was entitled to conclude that Hegwood's hollow assertions about Thompson were nothing more than desperation tactics aimed at postponing the stroke of the clock at Midnight.

Concededly, Judge Henderson acknowledged that an alibi witness's testimony would be relevant and material. However, the Sixth Circuit's holding in similar circumstances is precisely on point here:

> The appellant's allegations . . . are . . . lacking in particular facts concerning the claimed alibi; they are the broadest of generalities and do not constitute a sufficient averment of facts to satisfy the requirements of Rule 17(b).

*United States v. Rigdon*, 6 Cir., 1972, 459 F.2d 379, 380, *cert. denied*, 1973, 409 U.S. 1116, 93 S.Ct. 917, 34 L.Ed.2d 700. *See also United States v. Conder*, 6 Cir., 1970, 423 F.2d 904, 909, *cert. denied*, 400 U.S. 958, 91 S.Ct. 357, 27 L.Ed.2d 267.

The appellant argues that the *Welsh* rule made it incumbent upon the government to show that the evidence sought was unbelievable, untrue or that the request was frivolous. Brief of Appellant at 17. This argument, however, turns Rule 17(b) on its head. Mr. Marshall on at least three occasions unequivocally stated that he did not know what testimony Thompson could give, and Hegwood never articulated one fact which would even come close to meeting the threshold necessity requirement. The idea that a defendant, on the day of trial, has to do no more than offer "a feeling" that a witness could "shed some light" on a possible alibi, which offer would then trigger a governmental burden to counter such an allegation, is patently absurd.

We do not mean to undercut in any manner *Welsh's* liberal construction of Rule 17(b). Indeed, we reaffirm the wisdom of the principles announced in *Welsh*.

However, we hold that under the extreme, aggravating circumstances of this case, detailed at length in Part I, Judge Henderson properly exercised his discretion in refusing to subpoena Thompson. The appellant's vacillation with regard to the

Kelley testimony and the school records, and the Court's generous response to that vacillation, is but one of many examples of the fairness afforded Hegwood in connection with his tardy and feeble attempts to establish an alibi. Moreover, the entire record before us overwhelmingly establishes the District Judge's unending patience and unfaltering efforts to give this appellant a fair trial.

### III. Continuance

The denial of a motion for a continuance is similarly a matter within the discretion of the trial judge. *E. g., Welsh, supra; Abshire, supra.* For reasons apparent from what we have already stated, Judge Henderson's denial of Hegwood's motion(s) did not constitute an abuse of discretion.

AFFIRMED.